The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rowell and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the N.C. Workers' Compensation Act.
2. An employee-employer relationship existed between the named employee and named employer.
3. The carrier liable on the risk is correctly named above;
4. Defendant-carrier has accepted plaintiff's occupational disease claim for bilateral carpal tunnel syndrome.
5. Defendant-carrier has denied plaintiff's occupational disease claim for bilateral CMC joint arthritis of the thumbs.
6. Plaintiff was paid temporary total disability benefits from November 6, 2003 through December 3, 2003.
7. The parties stipulated into evidence as Stipulated Exhibit #1, the Pre-Trial Agreement, as modified and initialed by the parties.
8. The parties stipulated into evidence as Stipulated Exhibit #2, I.C. Forms, employment record, including other documentation as referenced on table of contents.
9. The parties stipulated into evidence as Stipulated Exhibit #3, medical records.
10. The parties stipulated into evidence as Stipulated Exhibit #4, Plaintiff's job history, descriptions and photographs.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 47 years old, and had a high school education.
2. Plaintiff began employment with defendant-employer on May 19, 1997. Plaintiff was originally hired to work with defendant-employer as an assembler. Defendant-employer produces steel enclosure systems along with circuit boards.
3. Plaintiff's position as an assembler required her to put together the inside of the fixture by adding the circuit board, wires, nuts, and bolts. This was not a production line position, and plaintiff worked in this area for a couple of years.
4. Plaintiff testified that she began to experience numbness in her right hand while working as an assembler, but she did not notify defendant-employer of her complaints nor did she seek medical treatment at that time.
5. Plaintiff next worked in the "rivet" position which required her to rivet together shelving units. Plaintiff worked in this position for approximately a year.
6. Plaintiff later worked in the sanding room. Plaintiff testified that she began to experience significant problems with her hands while she was assigned to the sanding room. This position required plaintiff to lift steel doors from a wooden crate and place them on a table for sanding. The sander used was a palm sander that began to operate when pressure was applied. The operator would have to grip the sander in order to direct the operation of the machinery. The sander had a vibration and when her right hand tired, plaintiff testified that she would switch to using her left hand.
7. Plaintiff's minimum workday would be eight hours but plaintiff testified that she could work up to 12 hours a day, averaging approximately 46 — 60 hours a week.
8. In this position, it was not unusual for plaintiff to complete 20 — 22 doors, both sides during a day. During this time period plaintiff testified that she felt tingling in both of her hands.
9. Plaintiff moved to the "plate" line from the sanding position. This position required plaintiff to hang pieces of metal on a line where they were "dipped" and then dried. Plaintiff began to experience pain in her left hand while performing this job. This position required plaintiff to grip the parts in order to lift them up to hang on the line.
10. After performing on the "plate" line, plaintiff was transferred to the "daktari" line. This position was also known as the chassis assembly position.
11. Plaintiff testified that shortly after beginning this position, she began to experience pain in her arms, hands, and thumbs. According to plaintiff it was not her usual aches and pains. Plaintiff testified that she was switching from using one hand to the other in order to complete the job requirements.
12. The "daktari" line required that the operator utilize a gauge to determine if the chassis is good. The gauge weighs approximately 20 pounds and it is constructed of metal. This gauge had to be lifted from the floor and run through three holes on each chassis. It was estimated that plaintiff had to use the gauge 120 times during a shift.
13. Plaintiff was also required to use a rivet gun at a different position on the "daktari" line. In order to perform this job, plaintiff would be required to put a part on the chassis and use the rivet gun to secure the piece into place. Plaintiff was required to use her thumb in a gripping action in order to complete this function. Plaintiff also was required to use a screwdriver to attach the screws to the chassis. In order to do this function, plaintiff had to use her thumb to push the button to activate the screwdriver.
14. Another task on the "daktari" line required plaintiff's use of a grinder in order to smooth out burrs found in the chassis. Plaintiff notified her supervisor that she was having problems with her hands and that she could not sleep at night. Plaintiff was not directed for medical treatment by defendant-employer. According to plaintiff Mr. Troy McDonald from Human Resources came down to the line and filled out an accident report. Mr. McDonald did come down to the line and reviewed her job position on the "daktari" line. Mr. McDonald was not aware of any ergonomic studies being done while he was employed with Sanmina. Mr. Taylor, manufacturing manager with defendant-employer, confirmed that plaintiff complained to him about her hands. Mr. Taylor stated that the complaints began when the "daktari" line began to ramp up production.
15. Plaintiff sought treatment with Dr. Huff, an orthopaedic, on her own. Dr. Huff diagnosed plaintiff with bilateral carpal tunnel syndrome, worse in her right hand than her left hand. Dr. Huff also diagnosed her with bilateral carpometalcarpal joint arthritis (CMC) in her thumbs. As her right hand was worse than her left, Dr. Huff recommended carpal tunnel surgery on her right hand. Dr. Huff also recommended CMC arthroplasty. Dr. Huff believed that all of her conditions were related to her work. In Dr. Huff's opinion, plaintiff's employment placed her at an increased risk of developing both plaintiff's bilateral carpel tunnel syndrome, and her CMC arthritis in her thumbs.
16. Plaintiff was first examined by Dr. Schricker on October 28, 2003. He diagnosed plaintiff with bilateral carpal tunnel syndrome and bilateral CMC joint arthritis. Dr. Schricker issued plaintiff splints for both of her hands.
17. Plaintiff underwent right carpal tunnel release and an injection into her left thumb on November 6, 2003. Plaintiff was paid workers' compensation benefits for the time that she was out of work for her carpal tunnel release from November 6, 2003 until December 1, 2003. Defendant-carrier filed a Form 60 on November 17, 2003 indicating that plaintiff's average weekly wage was $384.00.
18. Plaintiff was released to return to work from her right carpal tunnel release on December 1, 2003.
19. Plaintiff testified that she was experiencing problems with her left thumb and contacted defendants regarding surgery on her left hand. Defendant-carrier denied any injury to the thumb and issued a letter stating such. The surgery on plaintiff's left thumb took place on December 11, 2003. Plaintiff filed the surgery for her thumb on her health insurance and received short-term disability benefits for her time out of work. Following this surgery plaintiff was out of work until the middle of February 2004.
21. Plaintiff returned to work in a light duty status and returned to full duty status approximately one month before the hearing of this matter before the Deputy Commissioner.
22. Plaintiff now requests that the Industrial Commission find that her bilateral CMC arthritis was the result of an occupational disease. However, the undersigned note that plaintiff never filed a claim for her right thumb.
Dr. Huff testified that plaintiff's employment could have aggravated her CMC arthritis condition. However, Dr. Huff testified that he could not say that plaintiff's employment would cause the condition.
23. Dr. Schricker testified that he was unsure of plaintiff's particular job description, and was never shown a video of plaintiff's job duties. Further, although Dr. Schricker testified that plaintiff's employment could be a contributing factor to the CMC arthritis, he testified that it would be difficult to ascribe contraction of the arthritis to her employment. Dr. Schricker testified that CMC arthritis is an ordinary disease of life to which the public is equally exposed.
23. The greater weight of the evidence fails to show that plaintiff's employment placed her at an increased risk of developing CMC arthritis.
24. The greater weight of the evidence fails to show that plaintiff's employment caused or significantly contributed to the development of plaintiff's CMC arthritis.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), a claimant must show that the employment exposed him or her to a greater risk of contracting the disease than the public generally.Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983). In addition, the claimant must show that the employment significantly contributed to, or was a significant causal factor in, the disease's development. Hardin v. Motor Panels, Inc., 136 N.C. App. 351,524 S.E.2d 368 (2000) (citing Rutledge v. Tultex Corp., 308 N.C. 85,301 S.E.2d 359 (1983).
2. Even where the condition was aggravated but not originally caused by the claimant's employment, a claimant must show that the employment placed him at a greater risk for contracting or developing the condition. Futrell v. Resinall Corp., 357 N.C. 158, 579 S.E.2d 269
(2003). Accordingly, plaintiff has failed to establish that she suffers from an occupational disease within the meaning of N.C. Gen. Stat. § 97-53(13).
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Plaintiff's claim for benefits must be and is hereby DENIED.
2. Each side shall pay its own costs.
This the 15th day of December, 2006.
 S/___________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER